FILED

07/21/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0732

DA 24-0732

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 157

STATE OF MONTANA,

Plaintiff and Appellee,

v.

KATIE IRENE GARDING,

Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2010-160
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Toby Cook, Larry Mansch, Cook & Associates PLLC, Missoula,
Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Roy Brown, Brad
Fjeldheim, Assistant Attorneys General, Helena, Montana

Matthew C. Jennings, Missoula County Attorney, Missoula, Montana

Submitted on Briefs: January 28, 2026

Decided:  July 21, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Appellant Katie Irene Garding (Garding) appeals from the December 16, 2024 Order of the Fourth Judicial District Court, Missoula County, reinstating her convictions for Vehicular Homicide While Under the Influence, Failure to Stop Immediately at an Accident Scene Involving an Injured Person, and Driving Without a Valid Driver's License. The District Court ordered the Montana Department of Corrections to resume custody over her. We affirm in part and reverse in part.

¶2 We restate the dispositive issue on appeal:

*Whether the District Court erred in reinstating Garding's convictions following Garding's outstanding motion for judicial substitution.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The facts underlying Garding's charges have been set forth on numerous occasions. *See State v. Garding* (*Garding I*), 2013 MT 355, 373 Mont. 16, 315 P.3d 912; *Garding v. State* (*Garding II*), 2020 MT 163, 400 Mont. 296, 466 P.3d 501; *Garding v. Mont. Dep't of Corr.* (*Garding III*), No. CV 20-105-M-DLC, 2023 WL 3086883 (D. Mont. March 27, 2023); and *Garding v. Mont. Dep't of Corr.* (*Garding IV*), 105 F.4th 1247 (9th Cir. 2024), *cert. denied*, ___ U.S. ___, 145 S. Ct. 1951 (2025). We will not recite them again as they have no bearing on the issue we need to resolve. On June 10, 2011, a jury convicted Garding of all charges and she received a total sentence of forty years to prison. *Garding I*, ¶ 17.

¶4 In 2013, Garding filed an appeal to this Court challenging her conviction on three grounds. *Garding I*, ¶ 17. Garding argued that the district court erred by limiting the

2

Defendant's cross-examination of the State's informant thus violating her right of confrontation; permitting an undisclosed expert witness to testify for the State; and preventing her expert from testifying regarding matters disclosed within the expert's report. *Garding I*, ¶¶ 20, 26, 35. We affirmed the district court. *Garding I*, ¶ 41. In our holding we concluded Garding had been afforded the opportunity to cross-examine the State's informant regarding any potential bias and was provided with ample time to interview the State's undisclosed expert witness. Further, we held that the district court's limitation on Garding's expert witness testimony was harmless error. *Garding I*, ¶ 40.

¶5     In 2015, Garding filed a petition for postconviction relief in the district court alleging she received ineffective assistance of counsel (IAC) due to her trial counsel's failure to hire an accident reconstructionist; discovery violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); and that a post-trial crash reconstruction analysis constituted newly discovered evidence satisfying the exception to the one-year time bar for postconviction relief petitions. *Garding II*, ¶ 10. The district court granted the State's motions for summary judgment and denied Garding's postconviction relief claim after a hearing. *Garding II*, ¶ 11. Garding appealed the denial of her postconviction relief petition in 2020. *Garding II*, ¶ 11. This Court affirmed the district court. *Garding II*, ¶ 42. We first held Garding's IAC claim failed under the *Strickland*[1] standard because the decision to not hire an accident reconstructionist was not outside the wide range of professionally competent assistance. *Garding II*, ¶ 23. Second, this Court concluded Garding's claim

---

[1] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

3

under *Brady* failed. We determined both the victim's x-rays and photos of an unrelated 2005 motor vehicle crash were not in the prosecution's possession. *Garding II*, ¶ 35. Further, the photos of the unrelated 2005 motor vehicle crash were not material or exculpatory and were, therefore, exempt from the requirements imposed by *Brady* on the prosecution. *Garding II*, ¶ 35. Finally, this Court found the district court correctly rejected Garding's new evidence claim, as the accident reconstruction analyses offered by Garding's experts were merely newly analyzed evidence. *Garding II*, ¶ 42.

¶6 In 2023, having exhausted state remedies, Garding filed a 28 U.S.C. § 2254(d)(1) petition for habeas corpus in federal district court challenging her convictions. *Garding III*, 2023 WL at *1. In Garding's petition, she raised three claims: (1) the State violated *Brady* by failing to produce x-rays of the victim's leg taken by Dr. Dale, (2) the State violated *Brady* by failing to produce the 2005 accident photographs, and (3) Garding's counsel was ineffective for failing to secure an accident reconstruction expert. *Garding III*, 2023 WL at *4. The federal district court concluded this Court had misapplied *Strickland* because the expert testimony of a crash reconstructionist would have established, within a reasonable degree of certainty, that Garding's vehicle could not have been the vehicle that struck the victim. *Garding III*, 2023 WL at *4. However, the federal district court denied Garding's *Brady* claims. *Garding III*, 2023 WL at *19. Accordingly, the federal district court granted Garding's writ of habeas corpus and ordered that the State, within 30 days, either (1) move to vacate the state criminal judgment and renew proceedings against Garding in the state trial court, or (2) immediately and unconditionally release Garding from all custody that was imposed for her prior convictions, and that Garding may not be

4

retried. *Garding III*, 2023 WL at *20. The State was required to file notice by April 21, 2023, with the federal district court if it intended to renew proceedings in state court. *Garding III*, 2023 WL at *20.

¶7 On April 19, 2023, the State filed a motion with the state District Court to renew proceedings and set a status hearing. Thereafter, the state District Court, "pursuant to the Order in the United States District Court," vacated Garding's criminal judgment, reinstated the 2011 Information, and renewed criminal proceedings against Garding. In response to the renewed criminal action, Garding filed a motion to substitute the district judge.

¶8 Both the State and Garding appealed and cross-appealed, respectively, the federal district court's partial grant of habeas corpus relief. *Garding IV*, 105 F.4th at 1250. While the proceeding was pending before the Ninth Circuit, the parties stipulated to continue the Status Conference in the District Court pending the Ninth Circuit's decision.

¶9 On June 28, 2024, the United States Court of Appeals for the Ninth Circuit reversed the federal district court's decision on the IAC claim and affirmed the denial of the *Brady* claims. *Garding IV*, 105 F.4th at 1260. The Ninth Circuit noted that the state court judgment had been set aside only because of the federal district court's habeas decision. It held "[t]he State here moved for a new trial in state court only under compulsion of the [*Garding III*] habeas order, which otherwise barred retrial." *Garding IV*, 105 F.4th at 1255. The Ninth Circuit concluded that this Court was "objectively reasonable in determining that Garding failed to establish an ineffective assistance of counsel claim under *Strickland* or any *Brady* violations." *Garding*, 105 F.4th at 1260.

5

¶10 In response to the Ninth Circuit's reversal, the District Court issued an order reinstating Garding's conviction in December 2024. In the order, the District Court stated it found the mandate from the Ninth Circuit controlling and ordered the Montana Department of Corrections resume its supervision over Garding. Garding appeals from this order.

## STANDARD OF REVIEW

¶11 In analyzing the legality of the sentence imposed, this Court looks to whether the sentencing court possessed the requisite statutory authority, whether the sentence was within the prescribed parameters of the sentencing statute, and whether the court observed the mandates of the sentencing statute. *State v. Ariegwe*, 2007 MT 204, ¶ 174, 338 Mont. 442, 167 P.3d 815 (citations omitted). Under the legality standard, this Court looks for the correctness of the district court's sentence, which is a determination of law, and therefore review is de novo. *Ariegwe*, ¶ 175.

## DISCUSSION

¶12 "States possess primary authority for defining and enforcing the criminal law." *Engle v. Isaac*, 456 U.S. 107, 128, 102 S. Ct. 1558, 1572 (1982). Thus, "[b]ecause federal habeas review overrides the States' core power to enforce criminal law, it intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Shinn v. Ramirez*, 596 U.S. 366, 376, 142 S. Ct. 1718, 1731 (2022) (citations omitted). Federal intervention into state criminal justice systems "disturbs the State's significant interest in repose for concluded litigation" and undermines the state's sovereign power to enforce criminal laws enacted by States' representative bodies. *Harrington v. Richter*, 562 U.S.

6

86, 103, 131 S. Ct. 770, 787 (2011). "If the state trial is merely a 'tryout on the road' to federal habeas relief, that 'detract[s] from the perception of the trial of a criminal case in state court as a decisive and portentous event.'" *Shinn*, 596 U.S. at 377, 142 S. Ct. at 1751 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S. Ct. 2497, 2508 (1977)).

¶13    The "conditional" writ of habeas corpus declares that a petitioner "is being held in custody in violation of his constitutional (or other federal) rights[,]" but delays release of the petitioner to allow the state an opportunity to cure the constitutional violation found by the federal court. *Harvest v. Castro*, 531 F.3d 737, 741-42 (9th Cir. 2008). When a federal district court issues a writ of habeas corpus, "[r]eversal undoes what the habeas court did and makes lawful a resumption of the custody." *Eagles v. United States*, 329 U.S. 304, 308, 67 S. Ct. 313, 316 (1946). *See Knewel v. Egan*, 268 U.S. 442, 448, 45 S. Ct. 522, 525 (1925) ("The order of the [d]istrict [c]ourt discharging the appellant from custody is reversed and the case remanded to the [d]istrict [c]ourt with direction to remand him to the custody of the present sheriff."); *James v. Amrine*, 140 P.2d 362, 366 (Kan. 1943) ("It follows . . . that the court below erred in ordering release of petitioner and that the [judgment ordering the] release of the petitioner . . . is reversed with directions to set aside the order of discharge and to deny the writ."). In *Eagles*, the Supreme Court explained:

> Under our decisions the case would be moot if the writ of habeas corpus had been denied below and, pending disposition of the petition here, [the petitioner] had received a discharge from the army. That situation, like the case of a prisoner who, pending an appeal from denial of a writ of habeas corpus, is granted bail, would present no existing controversy. Habeas corpus is the means of making judicial "inquiry into the cause of the restraint of liberty." . . . If the custody or restraint of liberty is terminated without use of the writ, the case is finished. *Different considerations are brought into play if custody is ended through the writ itself.*

7

*Eagles*, 329 U.S. at 306-07, 67 S. Ct. at 315 (citations omitted; emphasis added).

¶14 The *Eagles*' principle was applied in *Lovallo v. Froehlke*, 468 F.2d 340 (2d Cir. 1972), a case procedurally like this case in that the government was compelled to take an action following the issuance by the court of a writ of habeas corpus that was later reversed on appeal. Petitioner challenged the decision of the Secretary of the Army recalling him to active duty and the lower court granted petitioner's writ of habeas corpus as a conscientious objector. *Lovallo*, 468 F.2d at 341. The lower court was reversed by the Second Circuit which, relying on *Eagles*, explained that "[w]hen Lovallo was separated from the custody and control of the Army it was because of [the district court's] order and only because of it." *Lovallo*, 468 F.2d at 344-45. Similar to the facts present here, "[i]f there had been no [d]istrict [c]ourt order granting the writ of habeas corpus, the Army would not have dreamed of separating Lovallo from active duty . . . [and] . . . the action of the Army in following [the district court's] order is not fatal to its power to get Lovallo back upon a reversal of that order." *Lovallo*, 468 F.2d at 344-45.

¶15 The current controversy is a peculiar mix of the federal district court's order and Montana's substitution rule allowing for substitution of a district judge. Here, the federal district court issued an "alternative" order directing the State to reinstate proceedings by commencing a new trial within 30 days of the date of the order and by requiring notice be provided to the District Court on or before April 21, 2023, at 12:00 p.m., or otherwise Garding must be released from custody and may not be retried. The State sought to appeal the district court's issuance of the writ, but, as the Ninth Circuit recognized, was compelled

8

to reinstate proceedings or lose its option of prosecuting Garding. This action concomitantly required Garding to exercise her right of substitution or lose it for failure to have timely filed it. Importantly, because the conditional writ provided for dismissal or a new trial, Garding could file for substitution because a new proceeding would have commenced.

¶16    When the matter came back to state District Court following the Ninth Circuit's decision, Garding no longer had the option of a new trial. Although the better procedure would have been for the District Court to address Garding's pending substitution motion before acting on the State's motion to reinstate, the omission does not require vacatur under the unique circumstances of this case. Section 3-1-804(4), MCA, gave Judge Larson limited authority to determine whether the substitution motion was timely and effective. By the time the State moved to reinstate Garding's conviction, the Ninth Circuit had reversed the conditional writ, no renewed prosecution or retrial remained pending, and the legal predicate for Garding's requested substitution no longer existed. Thus, even assuming Garding's April 24 filing required a ruling, the motion could not afford her the relief she sought. The law neither does nor requires idle acts, § 1-3-223, MCA, and the law respects form less than substance, § 1-3-219, MCA. We therefore do not condone bypassing the substitution statute; we hold only that, in this unusual habeas-reversal posture, Judge Larson's failure to enter a separate order denying the substitution motion does not warrant vacating the reinstatement order.

¶17    Applying the foregoing authority to the facts here, we conclude that after the federal district court was reversed, what remained was for the state District Court to reinstate

9

Garding's conviction, as there no longer was a conditional writ that established a constitutional violation concerning Garding's state conviction. When the Ninth Circuit reversed the federal district court, it removed the conditional writ and nullified the order granting it, in addition to all actions that occurred thereafter. The decision of the Ninth Circuit specifically determined that Garding was not denied effective assistance of counsel and that she, therefore, was not entitled to a new trial. Accordingly, the substitution motion filed by Garding was of no consequence since the order upon which it was premised—the district court's order granting her writ—was reversed. Section 3-1-804, MCA, requires a new "criminal action" with an "initial pleading," and the triggering mechanism of an "arraignment." Because Garding was not granted a new trial, the requirements of § 3-1-804, MCA, never came into play. Here, due to the reversal of federal habeas corpus relief, Garding is no longer entitled to substitution for a retrial that is now a legal fiction. The effect of the Ninth Circuit's decision was to allow for reinstatement of Garding's conviction and continue the proceedings before Judge Larson, which is what the State did when it filed its motion to reinstate. There is no right of substitution in the middle of a proceeding, much less after the proceeding has been concluded and the defendant stands convicted. Thus, Garding had no right of substitution since there was no new proceeding triggering the substitution statute. This is because the effect of that reversal "und[id] what the habeas corpus court did and ma[de] lawful resumption of custody." *Eagles*, 329 U.S. at 308, 67 S. Ct. at 316.

¶18 However, when the State filed its motion to reinstate Garding's conviction, it filed a pleading to which Garding had a due process right to respond and be heard by the court.

Further, Garding is not prevented from seeking collateral relief by filing a new petition raising what has been described by the Dissent as reliable *new* evidence which follows our decision on Garding's first petition for postconviction relief. In the event Garding files another petition, it will be for the trial court to decide whether that evidence—the State's abandonment of its initial trial theory and tacit admission that it was physically impossible for the accident to have occurred as it was presented at trial—constitutes newly discovered evidence entitling Garding to another postconviction proceeding.

¶19 We conclude that Garding was not entitled to substitute the district judge in this proceeding because none of the statutory requirements of the substitution rule had been triggered. We further conclude that Garding is entitled to respond to the State's motion to reinstate her conviction.

## CONCLUSION

¶20 Affirmed in part and reversed in part. This matter is remanded for further proceedings consistent with this Opinion.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

11

Chief Justice Cory J. Swanson, concurring.

¶21     I concur with the Court's Opinion and disposition of this matter. I write separately to indicate agreement with the Special Concurrence and Dissent in two main respects.

¶22     First, the Special Concurrence and Dissent is correct that the United States District Court overstepped its habeas corpus authority in issuance of the alternative writ. There is a difference between ordering release of a state criminal defendant due to a violation of federal civil rights and improperly interfering with the state court's judgment and conviction. This prompted the reversal by the Ninth Circuit, but it created the problem of how the state district court could reverse its erroneous vacating of her conviction—which was an error forced upon it by the federal court. While I agree this situation forced the state district court into an error to undo its prior error, I join the Opinion because I believe the Court's outcome has provided a path to address the error.

¶23     Secondly, I share the concerns in the Special Concurrence and Dissent that the discovery of new evidence leaves us with the likelihood of a procedurally and/or factually innocent defendant. Not only is that every prosecutor's nightmare, but the possibility carries with it the realization the actual culprit of the fatal hit and run may still remain at large. While I agree the newly-alleged evidence may qualify for a new postconviction relief proceeding under *Henderson*, I do not join the recommendation that this Court should order Garding's exonerative release. Barring a change of position from the State, the evidence should be presented at the trial court level, requiring Garding to carry her burden to overturn her conviction. Garding's claims of innocence may or may not hold up under scrutiny of the adversarial process.

12

Justice Ingrid Gustafson, specially concurring in part and dissenting in part.

¶24 I specially concur that the District Court erred in reinstating Garding's conviction without providing her an opportunity to respond and be heard on the State's motion to reinstate her conviction. I also specially concur that as Garding was not granted a new trial, no new proceeding arose to trigger the right to seek judicial substitution. However, I part ways with the Opinion remanding to the District Court to permit Garding to respond and be heard as to the State's motion to seek reinstatement of conviction; I would instead vacate the District Court's order and remand for Garding's exonerative release. The District Court's order reinstating conviction was wrong as a matter of law, constitutionally intolerable as Katie Garding is substantively innocent, and ultimately a grave miscarriage of justice.

**Federal Habeas Rulings Do Not Revise State Court Rulings**

¶25 As a preliminary matter, the Ninth Circuit's mandate was not "controlling" and the District Court erred as a matter of law when it reinstated Garding's conviction on such basis. "Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him." *Fay v. Noia*, 372 U.S. 391, 430, 83 S. Ct. 822, 844 (1963) (overruled on other grounds). A federal court, however, can *only* act on the body of the petitioner; "it has no other power" and certainly "cannot revise [] state court judgment[s]," or reinstate state court convictions. *Fay*, 372 U.S. at 431, 83 S. Ct. at 844; *see In re Medley*, 134 U.S. 160, 173, 10 S. Ct. 384, 388 (1890) ("under

13

the writ of *habeas corpus* we cannot do anything else than discharge the prisoner from the wrongful confinement"). Thus, a grant of federal habeas relief to a state prisoner does not purport to interfere with any state court's criminal judgment or conviction. *Fay*, 372 U.S. at 431, 183 S. Ct. at 844. Indeed, it would be patent error for a federal court to revise or interfere in a state court's criminal proceedings. *See Wood v. Ercole*, 644 F.3d 83, 99 n.13 (2d Cir. 2011) ("[T]his Court only has the power to act on the body of the prisoner, not on the conviction itself."); *Coulter v. McCann*, 484 F.3d 459, 466 (7th Cir. 2007) ("There is no authority in the habeas corpus statute for a federal court to remand or transfer a proceeding to the competent state court."); *Dickerson v. Vaughn*, 90 F.3d 87, 92 (3d Cir. 1996) ("because federal courts should not interfere with a state's conduct of its litigation, a district court should not directly order a state to grant a defendant an appeal"); *Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir. 1998) ("we lack the ability to 'revise the state court judgment'" as "federal habeas power is limited, first, to a determination of whether there has been an improper detention by virtue of the state court judgment; and second, if we find such an illegal detention, to ordering the immediate release of the prisoner"); *Duhamel v. Collins*, 955 F.2d 962, 968 (5th Cir. 1992) ("A federal court does not, however, have authority to commute a death sentence to life imprisonment."); *Wilson v. Lawrence Cnty.*, 154 F.3d 757, 761 (8th Cir. 1998) ("A federal writ of habeas does not reverse or void the state judgment of conviction."); *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986) ("a federal district court or [federal] court of appeals has no appellate authority over a state criminal case and hence has no authority to 'remand' a case to the state courts"); *see also Moore v. Zant*, 972 F.2d 318, 320 (11th Cir. 1992) ("The grant of the writ says that

14

petitioner's current incarceration is unlawful, but it does not usually adjudicate the constitutionality of future state acts directed at the petitioner."). This limitation on federal habeas relief is further recognized by state courts. *See People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 555 (Ill. 2004) (holding that defendants' state court judgments, though now unenforceable, remained intact following grant of federal habeas relief because "the federal court had no authority to revise the judgment"); *Commonwealth v. Lesko*, 15 A.3d 345, 364-65 (Penn. 2011) ("[A] proper grant of federal habeas relief to a state prisoner does not purport to revise or interfere with the state court's criminal judgment."); *People v. Green*, 136 Cal. Rptr. 241, 242 (Cal. App. 1st Dist. 1977) ("[A] habeas corpus action in a federal district court is a collateral action in which relief is limited to acting upon the person of a state prisoner . . . . California courts also have recognized that a federal district court cannot impose a duty to act upon any state court and that a state court acts independently and voluntarily in responding to a federal order.").

¶26 Here, the Ninth Circuit recognized its limited power by merely ordering the federal district court to remove "the current federal court impediment to any state court reinstatement of the judgment and cancellation of the new trial." Thus, the mandate merely directed the federal district court to remove the conditional writ which had required the State to "move to vacate the state criminal judgment and renew proceedings against Garding in the trial court" or "unconditionally release Garding from all custody."

¶27 Acknowledging the removal of the federal court impediment, the State moved to reinstate Garding's conviction. The District Court requested briefing on the State's motion and Garding raised a number of constitutional issues, including that the District Court

15

lacked jurisdiction to rule on the State's motion on account of its failure to rule on her pending motion for substitution. Rather than address the jurisdictional and constitutional issues raised by Garding, the District Court reinstated Garding's conviction solely upon "find[ing] the Mandate from the United State [sic] Court of Appeals for the Ninth Circuit controlling." The mandate, however, only directed the *federal* district court to remove the federal habeas bar; it did not order reinstatement of Garding's conviction—nor could it, since its power as a federal court in habeas is limited to custodial releases.

¶28 The Ninth Circuit's reversal of habeas relief "undoes" the actions of the habeas court—that is, the U.S. District Court of Montana. Thus, the reversal "undoes" the U.S. District Court of Montana's issuance of the conditional writ, allowing the State to move to reinstate the conviction in lieu of pursing new proceedings, if it so chooses. The Ninth Circuit's reversal does not, however, "undo" the actions taken by the state District Court— that is, the Fourth Judicial District Court, Missoula County. At a minimum, the District Court had an obligation to exercise independent judicial authority to make an independent state law determination as to whether reinstatement was proper in light of the State admitting the physical impossibility of the theory of the accident it presented at trial.

¶29 Accordingly, the Ninth Circuit's mandate does not "undo" the District Court's April 20, 2023 Order Setting Scheduling Conference which vacated Garding's conviction, ordered her release from custody, and reinstated the May 16, 2011 Amended Information for the State to renew proceedings. Nor does the mandate "undo" the District Court's subsequent actions and related proceedings. The mandate merely removes the federal bar

16

on custody. Thus, the District Court erred as a matter of law when it reinstated Garding's conviction solely on finding the mandate "controlling."

**Garding's Conviction is Constitutionally Intolerable**

¶30   The reinstatement of Garding's conviction is constitutionally intolerable. The accident reconstruction tests, modeling, and expert analyses presented postconviction constitute new evidence sufficient to establish Garding's actual substantive innocence. Thus, the reinstatement of her conviction is the "quintessential miscarriage of justice," as it is the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *See Schlup v. Delo*, 513 U.S. 298, 324-25, S. Ct. 851, 866 (1995) (quoting *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 1077 (1970) (Harlan, J., concurring)).

¶31   Following her conviction, Garding brought a timely petition for postconviction relief alleging new evidence of actual innocence accompanied by claims of ineffective assistance of counsel on account of trial counsel's failure to hire an accident reconstructionist. Garding also alleged *Brady* violations based on the State's failure to produce x-rays of Parsons' legs, which depicted only a relatively minor fracture to his left fibula, as well as the State's failure to produce photographs of an unrelated 2005 vehicle-pedestrian accident involving a vehicle similar to Garding's which resulted in comparable injuries to the pedestrian but significant damage to the hood and windshield of the vehicle.

¶32   Following a hearing, the district court summarily dismissed Garding's new evidence claim and the *Brady* violation related to the x-rays. The court concluded Garding failed to

establish "that there was no way of conducting any of the new analysis in 2011," and that she failed to "show[] that the new evidence could not have been obtained in 2011." The district court did, however, allow the accident reports to be considered with respect to Garding's ineffective assistance of counsel claims.

¶33 After a hearing on Garding's remaining claims, the court denied postconviction relief, concluding the accident photos for which her *Brady* claim was based were not material and likely inadmissible. As to Garding's claim of ineffective assistance of counsel, the court found trial counsel's testimony "self-serving,"[1] and concluded her failure to retain an accident reconstruction expert was not so deficient as to deprive Garding of a fair trial. Garding appealed, challenging both the district court's summary judgment order and its order denying postconviction relief.

¶34 In *State v. Garding*, 2020 MT 163, 400 Mont. 296, 466 P.3d 501, this Court affirmed the district court's summary dismissal and the denial of postconviction relief. While I dissented from the majority opinion regarding Garding's claims of ineffective assistance of counsel and her alleged *Brady* violations, I agreed with the majority that the district court did not abuse its discretion in determining the accident reconstruction modeling and related expert analyses could have been obtained at the time of trial and therefore were not "newly discovered evidence." *Garding*, ¶ 45 (Gustafson, J., dissenting). However, our analysis of Garding's new evidence claim was based on an erroneous understanding of the

---

[1] The district court's characterization of trial counsel's statements as "self-serving" is perplexing given that trial counsel attested to her own deficient performance, which—if anything—casts doubt on her competency and taints her professional reputation.

law. In *Henderson v. State*, 2024 MT 253, 418 Mont. 431, 558 P.3d 749, decided just a few years after *Garding*, this Court acknowledged its jurisprudence regarding new evidence claims as not only vague, uncertain, and confusing, but flawed in its conflation of standards across various claim types, and manifestly wrong in its interpretation and extension of § 46-21-102(2) MCA, to free standing claims of procedural innocence—that is, claims for new trial based on new evidence raising a reasonable doubt as to a petitioner's guilt unaccompanied by any alleged trial error. *See Henderson*, ¶ 42. Accordingly, we overruled a series of cases which recognized freestanding claims of procedural innocence as well as those which had incorrectly conflated the standards for establishing new evidence claims. *Henderson*, ¶¶ 26, 28, 31, 33, 50 (overruling the following cases to the extent they are inconsistent with the holdings therein: *Marble v. State*, 2015 MT 242, 380 Mont. 366, 355 P.3d 742; *Crosby v. State*, 2006 MT 155, 332 Mont. 460, 139 P.3d 832; *Beach v. State* (*Beach I*), 2009 MT 398, 353 Mont. 411, 220 P.3d 667; *Beach v. State* (*Beach II*), 2013 MT 130, 370 Mont. 163, 302 P.3d 47; *State v. Redcrow*, 1999 MT 95, 294 Mont. 253, 980 P.2d 622; *State v. Pope*, 2003 MT 330, 318 Mont. 383, 80 P.3d 1232). Analyzing Garding's new evidence claim under the clarified standards articulated in *Henderson*, Garding is substantively innocent.

¶35 The Montana Post-Conviction Hearing Act (MPCHA) was enacted in 1967 to provide an exclusive state law remedy for collateral postconviction relief of state criminal convictions. Since its enactment, the Legislature has adopted several procedural bars to relief under the MPCHA, including an applicable statute of limitations. However, in response to the more restrictive procedural bars, this Court recognized a "fundamental

19

miscarriage of justice" exception based on federal constitutional due process. *Henderson*,

¶ 18. The fundamental miscarriage of justice exception includes three subtypes of new evidence based claims: (1) actual substantive innocence of guilt, as assumed cognizable by the United States Supreme Court in *Herrera v. Collins*, 506 U.S. 390, 404-05, 113 S. Ct. 853, 862-63 (1993); (2) actual procedural innocence of guilt accompanied by an allegedly unconstitutional trial error that is otherwise barred, as recognized in *Schlup*, 513 U.S. at 312-32, 115 S. Ct. at 860-69; and (3) actual innocence of death penalty eligibility, pursuant to *Sawyer v. Whitley*, 505 U.S. 333, 335-48, 112 S. Ct. 2514, 2517-23 (1992). *Henderson*, ¶ 18. While each of these subtypes of claims have been analyzed by the United States Supreme Court in terms of new or previously unconsidered evidence of actual innocence, "each ha[s] subtle but fundamentally distinct elements and standards largely derived from pertinent provisions or requirements of the Due Process Clause of the U.S. Const. amend. XIV." *Henderson*, ¶ 19. Therefore, though all three subtypes of claims are premised on new evidence of actual innocence, each warrants a different threshold determination.

¶36    Here, while Garding has a constitutional gateway challenge under S*chlup* predicated on her claims of ineffectiveness of counsel and the withholding of evidence by the prosecution, the State's admission postconviction that it was scientifically impossible for the accident to have occurred in accordance with the State's trial theory, along with the postconviction evidence presented by Garding, in my opinion, set forth a *Herrera*-based claim that alone warrants dismissal.

¶37    A *Herrera*-based claim is a freestanding claim of actual substantive innocence grounded in newly presented evidence that demonstrates the petitioner did not, in fact,

20

commit the offense. *Henderson*, ¶ 18. Thus, the new evidence is exculpatory in nature and entitles the petitioner to exoneration. *Henderson*, ¶ 22.

¶38 In *Herrera*, the United States Supreme Court recognized the execution of an innocent defendant as "constitutionally intolerable." *Herrera*, 506 U.S. at 419, 113 S. Ct. at 870 (O'Connor, J., concurring). However, under the facts of the case, the majority found the petitioner's claims unconvincing under any standard of proof and thus did not precisely define the required showing for such a claim. *Herrera*, 506 U.S. at 417-19, 113 S. Ct. at 869-70. Justice White, in his concurring opinion, contemplated a showing of newly discovered evidence that, in light of the record at trial, establishes "no rational trier of fact could [find] proof of guilt beyond a reasonable doubt." *Herrera*, 506 U.S at 429, 113 S. Ct. at 875 (White, J., concurring) (quoting *Jackson v. Virginia*, 443 U.S. 307, 314, 99 S. Ct. 2781, 2786 (1979)). Whereas Justice Blackmun discussed a showing of probable innocence, explaining that "[w]hen a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt." *Herrera*, 506 U.S. at 443, 113 S. Ct. at 883 (Blackmun, J., dissenting). Blackmun explained that the court should then be tasked with weighing the evidence in favor of the prisoner against the evidence of their guilt, noting that "[o]bviously the stronger the evidence of the prisoner's guilt, the more persuasive the newly discovered evidence of innocence must be." *Herrera*, 506 U.S. at 444, 113 S. Ct. at 883 (Blackmun, J., dissenting).

¶39 Reflective of the standard set forth in Blackmun's dissent, this Court has recognized *Herrera* to require a petitioner to affirmatively and unquestionably prove their actual

21

innocence with "reliable new evidence." *Henderson*, ¶ 50. Reliable new evidence is "evidence not previously considered at trial, and not redundant or cumulative in substance thereto—sufficient to satisfy [the claim at issue]." *Henderson*, ¶ 37. Such evidence may include, among other things, "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[] that was not presented" at trial. *Henderson*, ¶ 20, n.18 (quoting *Schlup*, 514 U.S. at 324, 115 S. Ct. at 865). **Markedly, under *Henderson*, "reliable new evidence" is not subject to any reasonable diligence requirement as to the timing of its discovery.** *See Henderson*, ¶ 33, n.31. Rather, the "'probative value' of the new evidence 'must be considered in light of the evidence of proof of petitioner's guilt at trial,' any 'inconsistencies' therewith, and the lack of any 'satisfactory explanation' as to the timing of the new evidence." *Henderson*, ¶ 37 (quoting *Herrera*, 506 U.S. at 417-18, 113 S. Ct. at 869-70).

¶40 In addition to the fundamental miscarriage of justice exception, Montana recognizes a statutory exception for postconviction claims based on new evidence of actual innocence. Section 46-21-102(2), MCA provides:

> A claim that alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner was convicted, may be raised in a petition filed within 1 year of the date on which the conviction becomes final or the date on which the petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.

Like *Herrera*, § 46-21-102(2), MCA, describes an exonerative freestanding claim of factual innocence based on new evidence of actual substantive innocence. *Henderson*, ¶ 50 (holding § 46-21-102(2), MCA, narrowly applies only to "postconviction claims for

22

exonerative release based on newly discovered evidence of actual substantive innocence of guilt"). Also like *Herrera*, the "evidentiary standard of proof for freestanding substantive innocence claims under § 46-21-102(2), MCA (1997), is reliable newly discovered evidence that, if proved and viewed in the light of the evidence as whole, would be sufficient to *affirmatively and unquestionably* establish that the petitioner did not engage in the criminal conduct at issue." *Henderson*, ¶ 50 (internal quotations omitted). Section 46-21-102(2), MCA, does however subject claims to a reasonable diligence requirement if the claim is filed more than one year after the conviction becomes final. *See* § 46-21-102(2) (petition must be filed "within 1 year of the date on which the conviction becomes final *or the date on which the petitioner discovers, or reasonably should have discovered, the existence of the evidence*, whichever is later").

¶41 Here, the accident reconstruction and expert analysis evidence presented by Garding and the State postconviction constitute reliable new evidence under *Herrera* and § 46-21-102(2), MCA. While the reconstruction modeling and expert analyses *could* have been conducted at the time of trial, they ultimately were not. The only accident reconstruction evidence presented at trial was testimony from Officers Hader, Novak, and Strauch theorizing the accident to be the result of a "clip" from a "swerving" vehicle, throwing Parsons 90 to 150 feet away from the point of impact. The form and substance of the postconviction evidence is clearly new; the jury never considered any reconstruction modeling or scientific analysis of the accident, nor did they hear evidence as to the physical impossibility of the State's theory. The evidence is in no way redundant or cumulative to the evidence presented at trial. Further, it is reliable as the accident reconstruction

23

modeling and analyses are scientific in nature. Accordingly, the evidence is "reliable new evidence," and because Garding's claim was brought within one year, the new evidence is not subject to the reasonable diligence requirement under § 46-21-102(2), MCA, which applies only to newly discovered evidence brought outside the limitations period.

¶42 As previously discussed, both *Herrera* and § 46-21-102(2), MCA, require a petitioner to affirmatively prove their substantive innocence in light of the proof of the petitioner's guilt at trial. Here, the evidence presented postconviction is highly probative, scientifically grounded, and irreconcilable with Garding's guilt. In light of the undisputed lack of damage to Garding's vehicle and the lack of any viable theory as to how the accident could have occurred, the accident reconstruction modeling and expert analyses affirmatively prove Garding's Chevy Blazer was not the vehicle that fatally struck Parsons on January 1, 2008.

¶43 Throughout trial, the State clearly struggled to make sense of the evidence. Dan Berry, who was walking along side Parsons at the time of impact, testified to the vehicle being a new SUV with rounded sides, and had initially thought it was a Dodge Durango, or something similar. According to Berry, the vehicle was traveling "extremely fast"— well over the 35 mph speed limit. In his initial interview, Berry estimated the vehicle's speed at about 60 mph, and in his testimony, he stated, "I didn't think someone could survive [the impact] just because it was – it was just too fast." Berry also explained he had seen Parsons carried on the hood of the vehicle with his shoulders and head up by the windshield "for a long time," "an eternity it felt like."

24

¶44 Officers Hader and Novak testified to initially looking for a dark colored SUV with heavy front-end damage based on Berry's description of the accident and the pedestrian throw distance (the distance of travel between the point of impact and where the pedestrian comes to rest), which was between 90 feet and 150 feet; 90 feet being the distance between the beer can Berry dropped when Parsons was struck and 150 feet being based on the location of tire tracks observed by Novak. However, the officers testified that after viewing Parsons in the morgue and observing the relatively minor injuries to his lower extremities, they concluded Parsons had been "clipped" by a swerving vehicle and refocused their search to vehicles with minor damage to the passenger side. Hader specifically told the jury that while "[m]ost people that take a front-end impact will end up hitting a windshield," "your vehicle damage is going to be minimal" in a swerving-type of impact, "especially if you're swerving in" and "in this case the only thing that was struck on Mr. Parsons was his left calf . . . then you put the fact that you have a big steel, aftermarket bumper on this vehicle, and you're going to minimize the damage to the front end of this vehicle again." Hader, who did not see the accident, also discounted Berry's eyewitness account, stating "it would be impossible" for Berry to have seen Parsons on the hood and windshield of the vehicle.

¶45 Notably, Hader conducted a traffic stop with Garding just a few hours after the accident and observed no damage or indication that her vehicle was involved in the fatal hit-and-run. Garding's vehicle was also photographed two weeks later on January 15,

25

2008,[2] and though there was tape on a fog light, the tape appeared older than two weeks and was not accompanied by any visible damage.

¶46    Garding was not connected to the accident until Teuray Cornell, a jailhouse inmate, came forward claiming to have information about the accident in December 2008—after the case had been cold for nearly a year.  According to Cornell, Garding and her boyfriend at the time, James Bordeaux, had been at his house all night on New Year's Eve.  Cornell claimed Garding came by the next day with her Blazer, told him she had hit something when she left his house the night before, and he then helped tape up her headlight that was damaged in the crash.  However, Cornell initially told officers that Bordeaux had been driving Garding's vehicle at the time of the accident. According to Cornell's cellmate, Cornell told him he was going to lie and say Garding was driving after Bordeaux was placed in his pod at the Missoula County Detention Center.  Ultimately, Cornell was never called to testify by the State on account of his story being replete with inconsistencies and contradictions; Garding and Bordeaux were never at his house on New Year's Eve and based on Hader's own observations of Garding's vehicle the next morning, there was no indication of recent damage to her headlight.

¶47    To connect Garding to the accident, the State primarily relied on the testimony of Bordeaux, who, in exchange for his testimony against Garding, was offered a favorable

---

[2] Garding's vehicle was photographed on January 15, 2008, after Garding had been named as a suspect in the January 1, 2008 burglary of Paul McFarling's home.

plea deal[3] for charges associated with the burglary and theft of a handgun belonging to another witness in this case, Paul McFarling. Remarkably, Bordeaux was unable to provide law enforcement with any evidence to corroborate his eyewitness account. Rather, Bordeaux consistently provided law enforcement with incorrect details—including the wrong location of the accident (at first he stated it occurred about a mile west of The Reno bar when it actually happened east of it) and the wrong type of interaction (he repeatedly described the accident as a "rollover" type of interaction in his interviews and prior testimony when the accident was conclusively not a rollover)—and would adjust his story to account for information only after he learned it through his interviews.

¶48     At trial, Bordeaux testified that Garding had been driving and he had been in the front passenger seat and Paul McFarling, an acquaintance they met earlier that evening, was in the back seat. Bordeaux claimed to have been turned around to talk with McFarling when he felt the car hit something. Bordeaux said he then turned back towards the windshield and saw a person "flying through the air."

¶49     Bordeaux's testimony, however, conflicted with the testimony of McFarling, who adamantly maintained that Garding did not hit anything that night. McFarling explained he had no reason to lie to protect himself or Garding; not only was he granted immunity from prosecution by the county attorney in exchange for information about the accident, but he only just met Garding and Bordeaux that night and the two had then stolen his gun

---

[3] The State indicated that it intended to pursue a persistent felony offender designation against Bordeaux, exposing him to a potential sentence of up to 100 years. In exchange for his testimony, the State agreed to recommend a five-year suspended sentence.

the next day. In fact, McFarling called the Missoula Police Department at 4:00 p.m. on January 1, 2008, to report that Garding and Bordeaux had burglarized his home.

¶50 The State also tried to explain the lack of damage to Garding's vehicle by stressing the Blazer's "unique . . . aftermarket, custom made, steel bumper," which it repeatedly referred to as a "cowcatcher." According to the State, the bumper—which was only a three inch by three-inch metal tube sitting below the Blazer's grill—was "designed to protect the passengers of the vehicle," along with the vehicle's grill, headlights, and windshield, and "appears to be a match" for the bruising 14 to 17 inches high on Parsons' calves.

¶51 The postconviction evidence, however, establishes Garding's vehicle was not involved in the fatal interaction. The KARCO crash test establishes Garding's Blazer would have significant front-end damage had it struck Parsons at the speed required to obtain the undisputed minimum 90-foot throw distance. Specifically, the test—which used a 1994 Chevrolet Blazer 5-Door MPV equipped with a modified bumper matching Garding's—demonstrates that a collision at 35 mph with a pedestrian of Parsons' size would result in the pedestrian being carried up onto the front of the Blazer for approximately 120 feet, resulting in significant damage to the vehicle's hood and windshield. While 120 feet of travel is consistent with the estimated throw distance and Berry's eyewitness testimony, the condition of the test vehicle differed markedly from Garding's damage-free Blazer.

¶52 Virtual testing further establishes that a pedestrian impact would significantly deform the hood and windshield of the Chevy Blazer even at speeds of 20 mph, regardless of the pedestrian's position relative to the vehicle (whether positioned in the vehicle's

28

center, center-right, or right) and regardless of whether the pedestrian was standing or walking.

¶53 As a report submitted by Dr. Harry Towne, a professional mechanical engineer, notes, "the major and obvious flaw in the State's case is the total lack of damage to the front of the Blazer." Dr. Towne's report explains it was not possible to obtain the minimum throw distance under the State's partial contact theory; had Parsons been "clipped," he would have rotated and remained close to the location of impact. Dr. Towne's analysis further explains that the lateral motion in a "clip" or "swerve" is very small compared to the forward motion and states the vehicle would have undergone damage when the first forward foot of motion took place, which would have been well before any significant side motion occurred. Dr. Towne explains the collision speed of a vehicle-pedestrian impact can be determined by using correlations between vehicle speed, the total travel distance of the pedestrian from impact to rest (the throw distance), and the friction coefficient of sliding for the pedestrian (if applicable). Using two common formulas and the 90 to 150 foot throw distance range, Dr. Towne concludes Parsons was struck by a vehicle traveling between 37 and 52 mph.

¶54 An analysis by Keith Friedman, an engineer specializing in accident reconstruction and vehicle design development, similarly concludes the testimony of Novak and Hader regarding pedestrian kinematics "violates the law of physics." Further, Friedman asserts "the leg injury ascribed to the height of the bumper could have occurred from virtually any other bumper in the United States" due to National Highway Traffic Safety Administration

29

regulations.[4]  Further, citing biomechanical literature, Friedman shows that both of Parsons' tibias would have been "catastrophically fractured" had they been struck by a steel pipe equivalent to Garding's bumper even at a speed of 15 mph.  Based on virtual testing, Friedman concludes Parsons' injuries are more consistent with an impact from a modern vehicle equipped with a "more energy absorbing front end design[], like the Ford Explorer," which would result in "much lower impact loads to the lower legs."

¶55    Friedman also finds the lack of damage to Garding's vehicle to be in "no way consistent with a pedestrian impact sufficient to kill a walking adult person," noting that even at a speed of 15 mph *some* damage would be visible on the Blazer.  Ultimately, Friedman concludes "that [] Garding's vehicle was not involved in a fatal pedestrian impact on January 1, 2008."

¶56    **In response to the new evidence presented by Garding, the State submitted an expert report from Trooper Smart which completely abandons the State's theory of the accident as a high speed "clip," as it presented at trial**, and instead concludes that the accident was a low speed wrap-and-carry interaction, meaning Parsons was "wrapped" onto the hood of the vehicle and "carried" some distance before falling off.  In an attempt to discredit the KARCO test, Trooper Smart deems the test to be "an experiment where neither the result to the vehicle, nor the ATD, nor the road, matches the actual event." However, this statement by Trooper Smart highlights the significance of the KARCO test;

---

[4] The National Highway Traffic Safety Administration has required passenger cars to provide impact protection within a standardized vertical zone of 16 to 20 inches since the 1970s.  49 C.F.R. § 581.7 (1977).  As a result of this regulation, vehicles are generally manufactured to have bumpers at heights between 16 and 20 inches.

despite using a vehicle replicating Garding's and a dummy the same size and weight as Parsons, the results do not match the actual event. Had Garding struck Parsons, the Blazer would have visible damage.

¶57    Similar to Garding's experts, Trooper Smart calculates the impact speed using validated, widely accepted throw distance formulas and arrives at a range of 36 to 58 mph.[5] These calculations are consistent with the physical evidence and with methodologies Trooper Smart acknowledges as reliable. Yet, in an effort to align his conclusions with the State's new theory, Trooper Smart discards his own results. He asserts that "the only way to explain the particular extent of the injuries to Mr. Parsons is to accept that it was a low-speed collision,"[6] and declares that "all the formulas can be ruled out" because the velocities they produce "are not consistent with the injuries experienced by Mr. Parsons." Trooper Smart's reasoning proceeds from this premise rather than from the physical evidence. He labels Parsons' injuries as "minor," cites a study by Andrew Happer indicating that minor injuries typically occur at 12 to 16 mph, and then concludes:

> I believe that the vehicle that struck Mr. Parsons was an SUV as stated by the witnesses. I believe that it was traveling below 20 m.p.h. and carried Mr. Parsons approximately 90 feet until Mr. Parsons fell off and struck his head on the ground suffering a fatal head injury. I believe Ms. Garding's Blazer is a good candidate to break a

---

[5] Trooper Smart uses three different validated formulas to calculate the impact speed based on the throw distance, including the "Searle Equation," as provided by Searle, J*., The Physics of Throw Distance in Accident Reconstruction*, Society of Automotive Engineers (1993), which Trooper Smart notes as "the most recent and widely repeated and peer-supported work," and provides a range of 36 to 51 mph.

[6] Of course, the only way to accept the testimony of Officers Hader and Novak, the eyewitness testimony of Berry, and the particular extent of the injuries to Parsons is to conclude Garding's Blazer was not the vehicle that struck Parsons—conclusively borne out by the accident reconstruction modeling and analysis—which did not fit with the result Trooper Smart desired.

> pedestrian's leg at this low speed as it has a thin, projecting bumper that contacts a pedestrian's legs in advance of the rest of the grill. In fact, that 3" bumper matches the decedent's injuries. The absence of damage to her vehicle is a result of a low speed interaction.

**Despite Trooper Smart's contortions to try to come up with a new theory as to how Garding's vehicle struck Parsons, different than the scientifically disproven theory the State presented at trial, this new theory is likewise not supported by the physical evidence.**

¶58     Trooper Smart asserts that a wrap-and-carry event at a low speed would leave little to no deformation to the vehicle because "some deformation may be seen on flat expanses of steel, like a flat hood, but if the force was applied along sections where the steel is bent (edge of fenders or chines) then I would not expect [deformation]." But this explanation does not withstand scrutiny when applied to Garding's actual vehicle. Garding's Blazer features a broad, flat, hollow hood that extends the entire width of the vehicle—precisely the type of surface Trooper Smart acknowledges is susceptible to visible deformation in a wrap-and-carry impact. Moreover, the front passenger-side antenna, which stands above the fender and would be one of the first components contacted by a pedestrian torso or shoulder in a carry event, is entirely undamaged. Trooper Smart offers no account for how a pedestrian could be lifted, carried 90 feet, and then projected off the hood without leaving any deformation on the hood, fenders, grill, or antenna. Thus, while Trooper Smart rejects his own formula-based speed calculations on the ground that they do not match his injury-based assumptions, he never reconciles his low-speed theory with the objective physical evidence—namely, the complete absence of damage to Garding's Blazer in areas

32

that would necessarily deform in the wrap-and-carry collision he describes. The internal inconsistency between Trooper Smart's methodology and the undisputed condition of Garding's Blazer significantly undermines the reliability of his conclusions.

¶59 Further, in abandoning the State's trial theory, Trooper Smart also expressly rejects the testimony of Officers Hader and Novak, and the eyewitness testimony of Berry and Bordeaux. Trooper Smart specifically notes Hader as being incorrect in concluding that it "would pretty much be impossible" for Berry to have seen Parsons being wrapped and carried on the hood of the vehicle. To demonstrate the falsity of Hader's conclusion, Trooper Smart references a "simple experiment" he did; he went out to a parking lot and took a photo of someone on the hood of a vehicle while he stood behind the vehicle at the vantage point Berry would have had. The person on the hood is clearly visible in the photo. Trooper Smart also concludes the testimony of Hader and Novak referring to the collision as a "clip" resulting from a "swerve" to be "incorrect," explaining that the vehicle "clearly struck the back of both of [Parsons'] legs," as established in the postmortem report.

¶60 Trooper Smart's report also directly conflicts with the eyewitness testimony provided by Bordeaux. If the accident had been a wrap-and-carry at less than 20 mph, which the State now acknowledges "as the only way to explain" the nature of Parsons' injuries, Parsons would not have flown through the air upon impact, as Bordeaux claims, but up and onto the hood and windshield where he would have remained for 3.5 to 5.3 seconds,[7] directly in front of Bordeaux.

_____

[7] Based on the time for a vehicle to travel 93 feet at 12, 15, and 18 mph, Parsons would have been on the hood for 5.3, 4.9, and 3.5 seconds, respectively.

¶61    In supplemental reports, Garding's experts vehemently reject Trooper Smart's low speed wrap-and-carry theory by pointing to established physical evidence, such as the severity of Parsons' injuries, the minimum throw distance, and the fact that Parsons' shoes were found 160 feet from the point of impact. Specifically, the experts point out that Trooper Smart ignores the fact that this was a *fatal* accident and thus corresponds to a speed of over 35 mph on the Happer scale, not a range of 12 to 16 mph. Further, the experts point to an updated Happer study which provides that "the pedestrian throw distance should *always* be analyzed to provide a more accurate vehicle speed assessment" and further cautions accident reconstructionists against using injuries as the final determination of speed.

¶62    Further, while Trooper Smart opines that the interaction resulted in Parsons being carried 90 feet rather than thrown, Garding's experts cite Happer to explain that a wrap-and-carry requires an even higher impact speed than the pedestrian throw speed. Indeed, additional virtual testing conducted at speeds between 12 and 18 mph failed to produce a wrap-and-carry interaction or the 90-foot minimum throw distance (most resulted in partial run overs).

¶63    At this point, to support reinstatement of Garding's conviction, **the State has abandoned—and its own expert expressly admitted the physical impossibility of—the theory of the accident it presented at trial under which Garding was convicted.** It has instead devised a new low speed wrap-and-carry accident theory which is not only completely at odds with the scientific accident reconstruction modeling and analyses but also has never been presented to a jury.

34

¶64 Accordingly, in light of the State's abandonment of its trial theory and admission that it was physically impossible for the accident to have occurred as it presented at trial, the accident reconstruction modeling and expert analyses establish that Garding's Chevy Blazer was not the vehicle that fatally struck Parsons on January 1, 2008. Had the Blazer been involved, the Blazer would have visible damage consistent with a fatal pedestrian interaction. The postconviction evidence offered by Garding's experts is further supported by Berry's eyewitness testimony of a high-speed impact, and McFarling, who has adamantly maintained that Garding did not hit anything that night. While Bordeaux claims to have seen Garding hit Parsons, his past relationship with Garding, his plea deal, and most notably, his inability to provide any accurate details based on his own independent knowledge, raise significant concerns as to the credibility of his testimony, which ultimately does not hold up in light of the accident reconstruction evidence and the lack of damage to the Blazer.

¶65 As to Garding's timing in asserting the new evidence, her postconviction claim is timely; she has not waited on this evidence or intentionally manufactured any delay. *See McQuiggin v. Perkins*, 569 U.S. 383, 400, 133 S. Ct. 1924, 1936 n.4 (2013) (noting that "[a] showing that delay was part of a deliberate attempt to manipulate [a] case, say by waiting until a key prosecution witness died or was deported, might raise a different ground for withholding equitable relief"). Garding's failure to present the accident reconstruction modeling and expert analyses at trial is no fault of her own, as acknowledged by her own trial counsel. Further, some of the accident reconstruction modeling and testing presented,

35

particularly the KARCO test, was not available to Garding at the time of trial due to prohibitive costs and Garding's status as an indigent defendant.

¶66 Garding has presented reliable new evidence that is not only highly probative in light of the evidence presented at trial, but grounded in science and irreconcilable with Garding's guilt. In light of the undisputed lack of damage to Garding's vehicle, the new evidence eliminates any plausible basis for Garding's conviction. **Garding has affirmatively proved her substantive innocence under both *Herrera* and § 46-21-102(2), MCA, and is entitled to exoneration**.

¶67 In conclusion, I would vacate the District Court's order reinstating Garding's conviction as it is wrong as a matter of law. However, because Garding has established her substantive innocence, I would remand for Garding's exonerative release.

/S/ INGRID GUSTAFSON